UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SYMBIONICS, INC.,                )
                                 )
              Plaintiff,          )
                                 )
      v.                          )          No. 1:08cv44 (AJT/TRJ)
                                 )
CHRISTOPHER J. ORTLIEB, *et al.*, )
                                 )
              Defendants.         )
_____)

## MEMORANDUM OPINION

This action arises out of a dispute between the Plaintiff Symbionics, Inc ("Symbionics")

and its former president Christopher J. Ortlieb.[1]  Plaintiff asserts the following causes of action

against various Defendants:[2]  (1) breach of contract; (2) breach of officer's fiduciary duty; (3)

wrongful or tortious interference with contract and/or contract expectancy; (4) misappropriation

of trade secrets; and (5) injunctive relief.  Defendants assert the following counterclaims against

Symbionics:  (1) breach of contract (Symbionics shares and damages or, in the alternative,

specific performance); (2) breach of contract (payments); (3) unjust enrichment (first loan); (4)

unjust enrichment (second loan and additional expenses); and (5) conversion (or, in the

alternative, detinue).

---

[1] This action was originally filed in the Circuit Court for Fairfax County and was removed by the defendants pursuant to 28 U.S.C. § 1441 *et seq.* based on the parties' diversity of citizenship.

[2] The named Defendants include Christopher Ortlieb, Amy Ortlieb, OPM, LLC ("OPM"), ATACC System, LLC ("ATACC"), Warfighter Technologies, LLC ("Warfighter") and John Babcock ("Babcock").  Symbionics subsequently voluntarily dismissed Babcock pursuant to Fed. R. Civ. P. 41(a)(1).

On November 17, 18, 19 and December 22, 2008, the case was tried without a jury on Symbionics' amended complaint and Defendants' amended counterclaims.[3] The parties subsequently submitted revised proposed findings of fact and conclusions of law. Based on the evidence at trial, reasonable inferences drawn therefrom and the Court's assessment of the credibility of the witnesses, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

## FINDINGS OF FACT

1.      Plaintiff and Counterclaim Defendant Symbionics is a Virginia corporation formed on October 29, 1997, with its principal place of business in Virginia. Symbionics provides software development services and hardware solutions to its customers, including the federal government. Tr. at 354:13-19. Symbionics has 5,000 authorized but unissued shares, all of which are held by Kenneth Kaplan, who served as Chief Executive officer of Symbionics until November 2006. Tr. 433:16; 462:11-463:14.

2.      Defendant and Counterclaim Plaintiff Christopher Ortlieb is a citizen of the State of Maryland. Christopher Ortlieb served as President of Symbionics from January 3, 2005 until February 16, 2007, pursuant to a written employment agreement (the "Agreement"). Tr. 91:24 – 92:1. Before joining Symbionics, Ortlieb had extensive business experience in government contracting and had established extensive relationships with government contracting agencies, including Naval Air Systems Command ("NAVAIR") in particular. Tr. at 745:16-18; 736:8-10.

3.      Defendant OPM was formed by Christopher Ortlieb in January 2003. At the time he joined Symbionics, Mr. Ortlieb was the owner, President and Chief executive officer of OPM.

---

[3] The named Counterclaim Plaintiffs include Christopher Ortlieb, OPM and ATACC.

In March 2007, after Mr. Ortlieb's relationship with Symbionics terminated, OPM changed its name to ATACC. Tr. at 726:4-15.

4.       Defendant Amy Ortlieb is married to Christopher Ortlieb and in early 2007 became the managing member and majority owner of OPM/ATACC in order to make it a "woman owned enterprise" for government contracting purposes. Tr. at 512:21-514:3; 698:6-24.

5.       Defendant Warfighter is a limited liability corporation organized pursuant to the laws of the State of Florida. John Babcock is Warfighter's owner and principal. Tr. at 671:22-23. Warfighter is a service-disabled, veteran-owned provider of services and equipment to the federal government. Tr. at 670:12-13.

6.       Symbionics and Mr. Ortlieb entered into an Agreement, effective January 3, 2005. *See* Def.'s Ex. 1. The initial version of the Agreement was drafted by Symbionics. The final version of the Agreement was a product of negotiations between Symbionics and Mr. Ortlieb. Tr. at 617:1 – 620:18.

7.       As a result of the Agreement, Mr. Ortlieb became the President and a full time, at-will employee of Symbionics. *See* Def.'s Ex. 1 at ¶ 1(b) and 2(a).[4]  Also as part of the Agreement,

---

[4] Paragraph 1(b) provides:

> The term of Employee's employment hereunder shall commence as of the Effective Date and shall continue on an at-will basis. The period during which Employee is actually employed by the Company is referred to as the "Employment Period."

*Id.* at ¶ 1(b).

Paragraph 2(a) of the agreement provides in pertinent part:

> [Mr. Ortlieb] agrees that throughout the Employment Period he will devote his full business and professional time in utilizing his business and professional expertise with proper attention, knowledge, and skills faithfully, diligently, and to the best of his ability in furtherance of the business of [Symbionics] and its

Mr. Ortlieb agreed to transfer to Symbionics all existing and future contracts obtained by OPM.[5]

In return, Mr. Ortlieb was to receive a base salary of $85,000 per year, to be reviewed quarterly,

plus a merit bonus "if appropriate." *Id.* at ¶¶ 3-4; Tr. at 277:17-19.[6]  He also was to receive

---

subsidiaries and will perform the duties assigned to him in accordance with this
Agreement.

*Id.* at ¶ 2(a).

[5] Paragraph C of the Agreement provided in pertinent part:

[Mr. Ortlieb] is exchanging all of the assets of OPM, LLC (OPM) to
[Symbionics] including, but not limited to, its technical revenue producing
contracts for the performance of services, delivery of product, and intellectual
property of any type, existing and future, subject to the express understanding that
[Symbionics] accepts none of the financial obligations of [Mr. Ortlieb] or OPM to
anyone or entity including, but not limited to vendors and or creditors of [Mr.
Ortlieb] or OPM  in connection therewith and [Mr. Ortlieb] acknowledges that
[Symbionics] is not responsible for any such obligations as the result of this
Agreement and, in addition, [Mr. Ortlieb] and/or OPM shall remain solely
responsible for those assets not being transferred to [Symbionics] as part of this
Agreement.

*Id.* at ¶ C.

[6] Paragraphs 3 and 4 of the Agreement provide:

    3.    Base Salary.  As compensation for [Mr. Ortlieb's] services
hereunder, [Symbionics] shall pay to [Mr. Ortlieb] a base salary (Base Salary) at
an annual rate equal to Eighty Five Thousand Dollars ($85,000), payable in
accordance with [Symbionics'] normal payroll practices.  The Base Salary will be
subject to review on a quarterly basis in the context of certain objectives and
criteria to be determined by the mutual agreement of [Mr. Ortlieb] and the Chief
Executive Officer of [Symbionics].  [Symbionics] acknowledges that, while the
Base Salary is subject to periodic review, [Mr. Ortlieb's] salary shall not fall
below $75,000.00 per annum during the Employment Period.

    4.    Bonus.  In addition to the Base Salary, [Mr. Ortlieb's] performance
shall be periodically evaluated by the Chief Executive Officer of [Symbionics]
and [Mr. Ortlieb] to determine whether a merit bonus is appropriate.

*Id.* at ¶¶ 3, 4.

twenty percent of the outstanding shares of Symbionics, "subject to the condition precedent that [Mr. Ortlieb] remain voluntarily employed with [Symbionics] for a period of not less than five (5) years. However, if Symbionics "is acquired prior to the 5th year anniversary of [Mr. Ortlieb's] employment, [Mr. Ortlieb] shall earn and be vested to . . . 20% [of the outstanding shares of Symbionics], prior to said acquisition." *Id.* at ¶ 5. The Agreement further provides, however, that "to the extent that [Mr. Ortlieb] does not stay employed at [Symbionics] throughout the entire five (5) year period by reason of his voluntary action, he relinquishes any and all rights to any shares in [Symbionics]." Def.'s Ex. 1 at ¶ 5. In the event of his involuntary termination within the first five years, the Agreement also provides that Mr. Ortlieb would still be entitled to shares of Symbionics and other compensation according to the following formula:

> [i]n the event that [Mr. Ortlieb] is involuntarily terminated by [Symbionics] prior to the 5th year anniversary of his employment [Ortlieb] shall receive shares of [Symbionics] equal to one-third of one percent (.0033) of the outstanding shares multiplied by the number of months of service completed, including the month of termination, plus any Additional Shares acquired. Severance shall be paid in an amount equal to two (2) months salary for each year of service completed, including the year of termination, at [Ortlieb's] highest Base Salary for the last completed year of service.

*Id.* at ¶ 7(b).

8.      The Agreement also contained a covenant not to compete that restricted Mr. Ortlieb for a period of twelve months following any separation from Symbionics.[7] Symbionics agreed,

---

[7] Paragraph 6 of the Agreement provides:

> [Mr. Ortlieb] agrees that he will not, during the course of their engagement with [Symbionics] or for a period of twelve (12) months commencing upon the expiration of his employment with [Symbionics], voluntarily or involuntarily, for any reason whatsoever, directly or indirectly, individually or on behalf of persons or entities not now parties to this Agreement, or as a partner, stockholder, director, officer, promoter, principal, agent, consultant, or in any other capacity or relationship, engage in any business, engagement or employment, or aid or endeavor to assist any business or legal entity, including [Symbionics']

however, that the covenant was waived if Mr. Ortlieb was "involuntarily terminated" before the fifth year of his employment. *Id.* at ¶ 7(d).[8]

9.      One of Mr. Ortlieb's primary responsibilities as Symbionics' President was business development. Tr. at 650:2-8; 682:5-13. At the time Mr. Ortlieb joined Symbionics, he had developed a number of ongoing business opportunities and had established relationships with government agencies and procurement officers and also other private government contractors, with whom he had partnered. Tr. at 622:1-4. Specifically, at the time Mr. Ortlieb joined Symbionics, he had secured a yet to be performed government contract through OPM to supply computers that met the Tactical Air Control Party ("TACP") requirements for the Air Force Research Lab ("AFRL") (the "AFRL transaction"). *Id.* at 630:8-10. Mr. Kaplan was aware of the AFRL transaction at the time the Agreement was negotiated and was one of the contracts to be transferred to Symbionics.[9] *Id.* at 631:3 – 632:11.

---

> customers, potential customers, or customers of [Symbionics'] customers, which is or may reasonably be expected to be in competition with the products and/or services of [Symbionics] including the products and services [Symbionics] provides to the federal government and/or local municipal or commercial entities in those localities in which [Symbionics] actively markets and/or provides its products and services.

*Id.* at ¶ 6.

[8] Paragraph 7(d) provides in pertinent part:

> [i]n the event that [Mr. Ortlieb] is involuntarily terminated by the Company prior to the 5th year anniversary of his employment [Symbionics] agrees to wave [*sic*] Covenant Not To Compete.

*Id.* at ¶ 7(d).

[9] OPM received $50,000 for the AFRL transaction. *Id.* at 632:14. After Mr. Ortlieb began working at Symbionics, the expenses incurred in connection with the AFRL transaction were paid by Symbionics and then Symbionics was reimbursed by OPM. *Id.* at 632:21 – 633:5. Mr. Ortlieb and Mr. Kaplan agreed that the AFRL transaction would a "zero dollar transaction" for

10.    At the time Mr. Ortlieb joined Symbionics, he was also in the process of bidding on two other contracts through OPM. The first was for computers used in the Air Force's Battlefield Communications Systems Experimental ("BCSX") program ("BCSX Computers"). Tr. at 622:2 – 627:25. The second was a program for the development of modular wearable computers ("MOWC") sponsored by the Naval Research Lab ("NRL"). *Id.* at 643:21-644:16. OPM was awarded the MOWC contract after Mr. Ortlieb joined Symbionics and the MOWC contract was transferred to Symbionics. *Id.* at 648:6-21.

11.    Consistent with the business development focus of Mr. Ortlieb's role, Mr. Kaplan and Mr. Ortlieb contemplated, or at least they did not regard as inconsistent with Mr. Ortlieb's duties and obligations to Symbionics, that Mr. Ortlieb would continue to explore and exploit business opportunities for Symbionics through OPM or other companies or relationships, as he had before joining Symbionics. Tr. at 631:14-20; 744:18-21. The Agreement itself contemplates such efforts, as it, in effect, required any future OPM revenue to be turned over to Symbionics. The Kaplans also knew, at least through 2006, that Mr. Ortlieb was in fact working through companies other than Symbionics to obtain business. *Id.* For example, in August 2006, Mr. Ortlieb structured a bid on a government contract through a business venture between OPM and Warfighter, a government contractor with whom Mr. Ortlieb had previously partnered, whereby Ortlieb submitted in the name of Warfighter two separate bids on government contracts for external hard drives, with the intention of transferring to Symbionics any funds that OPM received as a result of the venture. Tr. at 670:11-671:671:3; 671:19-672:5; Pl.'s Ex. 9; Tr. at 94:14 – 96:25; *see also* Pl.'s Ex. 10; Tr. at 672:8-15; 670:24-671:3. Warfighter was not awarded

---

Symbionics; in other words, Symbionics would be reimbursed for all expenses it incurred in connection with the transaction. Tr. at 633:19 – 635:8. Neither OPM nor Symbionics made a profit on the AFRL transaction and the remaining $3,500 belonged to OPM under the agreement as reimbursement for expenses OPM incurred. *Id.* at 633:19-21; 643:12-17.

the contracts.  Nevertheless, when the Kaplans learned of these bids in the fall of 2006, they did

not did not protest or object;[10] and in fact at trial, Mrs. Kaplan testified that she did not discuss

the bids with Mr. Ortlieb at the time because she did not want to accuse him of something and

she did not have enough information.  Tr. at 97:15-25; Tr. at 94:19 – 95:3; 97:15-18; 433:5-18;

*see also* Pl.'s Exs. 9, 10, 62, 67.  Likewise, Mr. Ortlieb maintained an active OPM website,

which the Kaplans monitored without protest until late December 2006, when, in the midst of

what was then a stormy relationship, Mrs. Kaplan directed Mr. Ortlieb to shut it down.  Pl.'s Exs.

43, 46.

12.     By 2006, Symbionics' financial condition became tenuous and Ortlieb agreed to loan to

Symbionics his personal funds to cover Symbionics' obligations.  For example, in May 2006,

Symbionics was unable to meet its payroll obligations and on May 1, 2006, Mr. Ortlieb loaned

Symbionics $33,000 from the equity line on his home.[11]  Tr. at 663:23 – 665:4; Def.'s Ex. 28; Tr.

at 665:5-12; 277:14-16.  On October 11, 2006, Mr. Ortlieb personally paid an outstanding

---

[10] After Mrs. Kaplan discovered information related to these bids, she discussed them with her
husband.  Mr. Kaplan felt that the information they had was very limited and the Kaplans did not
confront Mr. Ortlieb.  Tr. at 94:19 – 95:3; 97:15-18; 433:5-18; *see also* Pl.'s Exs. 9, 10, 62, 67.
Instead, and reflective of the growing tension between Mr. Ortlieb and the Kaplans, the Kaplans
installed software on Mr. Ortlieb's computer and began to monitor his computer use and the
back-up of his harddrive.  Tr. at 107:17-111:8; 433:22-434:13.

[11] Mr. Ortlieb did not receive a promissory note from Symbionics, however, he discussed the
terms of the loan with Christine Taddeo and Ken Kaplan.  Tr. at 666:10; 290:12-19.  Symbionics
and Mr. Ortlieb agreed, however, that in exchange for the loan, Symbionics would pay the
interest payments on the home equity loan that Mr. Ortlieb obtained and Symbionics would
repay the principal by no later than the end of the year.  Tr. at 666:12-25.  As of the time of trial,
Symbionics has not repaid the $33,000 loan to Mr. Ortlieb.

invoice in the amount of $20,000 from the Cormac Group ("Cormac"), a lobbying group that was assisting Symbionics in a large contract. Tr. at 445:13-14; 667:2-668:25.[12]

13.     The relationship between Mr. Ortlieb and Symbionics, and between Mr. Ortlieb and the Kaplans, became increasingly strained over time. Contributing to this deteriorating situation was the increasing role that Denise Kaplan came to play at Symbionics. In this regard, Denise Kaplan began her employment at Symbionics in May 2002 as the Director of Network Technologies. Tr. at 90:10-13. She and Mr. Kaplan subsequently married, Tr. at 653:6-16, and in November 2006, Mr. Kaplan appointed her the Chief Executive Officer of Symbionics, the position he previously held, and Mr. Kaplan directed Mr. Ortlieb to report to her.[13] Tr. at 91:1-3; Def.'s Ex. 17. It is a fair inference from the record that Mr. Ortlieb regarded this restructuring as unfair, unwarranted and inconsistent with the understandings that accompanied his joining Symbionics. *See* Tr. at 652:16-22; 693:5-8. It is also a fair inference that Mr. Ortlieb regarded Mrs. Kaplan as lacking his own level of business experience and training. *See id.*

14.     Following the appointment of Mrs. Kaplan as Symbionics' CEO, Mr. Kaplan increasingly disengaged from Symbionics' business affairs. Mr. Ortlieb, in turn, limited his interactions with Mrs. Kaplan and concentrated his efforts on business development. Mrs. Kaplan, for her part, continued to attempt to assert her authority over Mr. Ortlieb, who resisted

---

[12] Mr. Kaplan understood that Cormac was providing lobbing services to both Symbionics and another entity and that Symbionics had agreed to pay Cormac's bills, but would be reimbursed by the other entity also using Cormac's services. Tr. at 447:16-25. The $20,000 check Mr. Ortlieb wrote represented payment for about four months of services already rendered by Cormac. Tr. at 445:13-14; 667:2-668:25.

[13] At the time Mrs. Kaplan was appointed CEO, Mr. Kaplan also contemplated transferring 51% of the ownership of Symbionics to Mrs. Kaplan. *See* Def.'s Ex. 17. However, no such transfer of ownership was made during the time Mr. Ortlieb remained employed at Symbionics. Tr. at190:5-22; 695:25-696:8.

her efforts while pressing his claims for the re-payment of his loans and the other compensation benefits he thought he was entitled to. *See, e.g.*, Pl.'s Ex. 48.

15.     The situation became increasingly tense and issues between Mr. Ortlieb and the Kaplans proliferated. Emblematic of this stormy relationship was Mrs. Kaplan's instruction to Mr. Ortlieb in December 2006 that he shut down OPM's active website. Pl.'s Ex. 43.

16.     In January 2007, matters came to a head. The Kaplans learned that Mr. Ortlieb issued price quotes on behalf of OPM on various government contracts, including quotes submitted to NAVAIR for the BCS-X computers that Symbionics had previously provided to NAVAIR after an OPM contract was transferred to Symbionics. Specifically, on January 9, 2007, Russell Vetter, a NAVAIR representative, contacted Mr. Ortlieb via his Symbionics email address (chriso@Symbionics.net). NAVAIR requested a price quote for 36 JLT computers that were identical to computers Symbionics had previously supplied to NAVAIR. Tr. at 169:15-20; Ex. 15. Mr. Ortlieb responded to NAVAIR's request via his Symbionics email address. Tr. at 167:9-168:3; Ex. 18. On February 8, 2007, OPM, through Mrs. Ortlieb, as OPM's managing member, submitted a revised price quote to NAVAIR and identified OPM as a "small woman-owned business." The revised price quote was for 14 computers for $88,508. Tr. at 138:1-3. According to Mr. Ortlieb, the price quote was submitted by OPM, through Mrs. Ortlieb, because as a woman-owned company, OPM might be entitled to some preference. Symbionics at that time was not a woman-owned company, and Mr. Ortlieb was not confident at that time that Symbionics would become a woman-owned company. Tr. at 697:6-698:20.

17.     After learning of the NAVAIR bids in the name of OPM, the Kaplans hired "certified fraud investigators" who interviewed Mr. Ortlieb in early February 2007. Tr. 192:7-9. After that interview, on February 16, 2007, the Kaplans terminated Mr. Ortlieb's employment with

Symbionics. *Id.* at 192:10-13. Symbionics claims that Mr. Ortlieb was improperly competing with Symbionics. Symbionics also claims that Mr. Ortlieb breached the Agreement by not devoting "full time and attention" to Symbionics' business since Symbionics' monitoring of Ortlieb's computer revealed that on occasion Mr. Ortlieb used his computer for personal, non-business related purposes.[14] Tr. at 118:1-4; 123:15-124:1; 434:14-435:20; Ex. 104. Symbionics' monitoring also revealed that Mr. Ortlieb, who often worked more than eight hours in a given day, used his computer in large part for work-related purposes. Tr. at 250:19-23.

18.    Following his termination, Mr. Ortlieb asked for, but was refused, his last paycheck and the other stock and severance benefits set forth in the Agreement. Tr. 707:1. Before leaving his office, Mr. Ortlieb took certain personal property including a backpack, day timer, back-up harddrive, and his keys. Tr. at 707:7-18. Mr. Ortlieb did not take certain other personal property totaling $1,505.80, including Black Hawk gear that he paid for, eyeglasses, a picture frame his wife had given him, and other items, which Symbionics has since refused to return to him. Tr. at 707:5-711:25; Def.'s Ex. 32. Also at the time Mr. Ortlieb was terminated, he had incurred a number of expenses on behalf of Symbionics for which he has not yet been reimbursed. Tr. at 709:20-710:11; Def.'s Ex. 32. These outstanding expenses totaled $3,246.71. Tr. at 709:20-710:11; Def.'s Ex. 32. Mr. Ortlieb also retained a copy of the harddrive from his laptop computer supplied to him by Symbionics. Tr. at 707:12-22. That harddrive contained product diagrams, price quotes, and contracts, including the price at which Symbionics obtained BCS-X

---

[14] Symbionics relies on its Employee Handbook, which Mr. Ortlieb had received, as support for this position. Pertinent in this regard is Section 5.6 of the Employee Handbook, which provides that Symbionics maintains an electronic mail system "to assist in the conduct of [Symbionics'] business" and that said system "may not be used for personal business." Section 5.6 also provides that employees who violate this policy are "subject to discipline, up to and including termination." Tr. at 111:15-114:2; Ex. 2.

computers from other vendors. Tr. at 197:6-25; 198:7-20. Finally, Symbionics contends that

Mr. Ortlieb improperly took a "power squid" at the time his employment was terminated.

Although Ms. Kaplan recalls seeing a power squid on Mr. Ortlieb's desk approximately one

week before Mr. Ortlieb was terminated, Tr. at 327:1-3, Mr. Ortlieb testified that he did not take

a power squid from Symbionics and that he does not have the power squid. Tr. at 708:2-5.

19.     In February 2007, following Mr. Ortlieb's termination, Mrs. Kaplan contacted NAVAIR

by e-mail to inform it that Mr. Ortlieb was no longer employed by Symbionics and that

Symbionics was capable of fulfilling its needs for BCS-X computers. Tr. at 135:10-19.

NAVAIR did not respond to Mrs. Kaplan's e-mail and Symbionics did not contact NAVAIR

again. Symbionics did not sell the BCS-X computers to NAVAIR. Rather, on about April 20,

2007, OPM supplied the twenty-eight BCS-X computers initially requested by NAVAIR while

Mr. Ortlieb was employed at Symbionics. Tr. at 136:7-11; 137:12-138:3; Ex. 37 at ATACC

000006. OPM made a profit of $27,597.79 on the twenty-eight BCS-X computers. Pl.'s Ex. 37

at ATACC 000006; Tr. at 448:7-449:24.

20.     After Mr. Ortlieb left Symbionics, in addition to the twenty-eight BCX- computers

supplied by OPM in April, 2007, Mr. Ortlieb, through OPM, bid on other NAVAIR contracts

and OPM was awarded other contracts to supply computers to NAVAIR and other entities.

Those contracts called for the delivery of two BCS-X computers that were supplied to BAE, six

BCS-X computers that were supplied to NAVAIR and fifteen BCS-X computers that were

supplied to ARINC in 2008. *See* Tr. at 448:18-450:14; Ex. 37 at ATACC 000006.

21.     Some of these contracts awarded to OPM following Mr. Ortlieb's termination were

awarded on a sole source basis, justified on the grounds that OPM was the only available source

for the products. Tr. at 172:3-173:5; Pl.'s Ex. 16. There is no dispute that Symbionics also was

12

capable of supplying the BCS-X computers. Tr. at 135:20-23. There is also no dispute, however, that NAVAIR's intention to award these contracts on a sole source basis was publicly disclosed as required under federal procurement regulations and other contractors were invited to submit bids if they thought they were in fact alternate sources. Tr. at 172:3-173:5; Pl.'s Ex. 16. Symbionics, though aware of the prospect that these other contracts might be awarded to OPM, never submitted alternate bids or made any other attempts to obtain those contracts or inform the government that they were also capable of supplying BCS-X computers. Tr. at 225:24-226:6. There is also no evidence that since leaving Symbionics, Mr. Ortlieb or OPM used information confidential or proprietary to Symbionics in obtaining these contracts or otherwise.[15] Tr. at 264:3-265:7.

## CONCLUSIONS OF LAW

### A.    Amended Complaint

#### 1.    Count 1: Breach of Contract

In Count One, Symbionics argues that Mr. Ortlieb breached the Agreement by (1) issuing bids and seeking business in the name of and on the behalf of third party entities during the time he was employed as President of Symbionics; (2) failing to devote his full business and professional time to Symbionics; and (3) failing to use his professional expertise on behalf of

---

[15] The evidence regarding Symbionics' alleged trade secrets focused on information regarding the cost at which Symbionics acquired BCS-X computers and customer contact information. The BCS-X computer acquisition cost information and customer contact information was kept on a secured computer and was password protected. Tr. at 193:15-195:5; 425:8-23; 425:24 – 426:4. However, Symbionics did not manufacture the BCS-X computers itself, but obtained them from vendors such as JLT and Roper. Tr. at 216:22-218:11. These vendors sold BCS-X computers to entities other than Symbionics. *Id.* The price Symbionics charges the government for BCS-X computers would be listed on the quote provided to the government. Tr. at 262:3. The price at which Symbionics sells BCS-X computers to its customers has changed since Mr. Ortlieb's employment was terminated. Tr. at 261:6-20.

Symbionics.  The essential elements of a cause of action for breach of contract are (1) a legal

obligation of a defendant to a plaintiff; (2) a violation or breach of that obligation; and (3) a

consequential injury or damage to the plaintiff. *Hamlet v. Hayes*, 641 S.E.2d 115 (Va. 2007)

(quoting *Caudill v. Wise Rambler*, 168 S.E.2d 257, 259 (Va. 1969)).

Symbionics specifically contends that Mr. Ortlieb's actions constituted a breach of

Paragraphs 2(a) and 6 of the Agreement.  Paragraph 2(a) provides that "[Mr. Ortlieb] agrees that

throughout the Employment Period he will devote his full business and professional time in

utilizing his business and professional expertise with proper attention, knowledge, and skills

faithfully, diligently, and to the best of his ability in furtherance of the business of [Symbionics]

and its subsidiaries and will perform the duties assigned to him in accordance with this

Agreement." Def.'s Ex. 1 at ¶ 2(a).  The evidence at trial showed that Mr. Ortlieb used his work

computer for non-work related purposes.  However, the evidence also showed that Mr. Ortlieb

often worked more than eight hours in a day.  Furthermore, while at Symbionics, there was no

evidence that Ortlieb had set work hours; or that Ortlieb otherwise failed to discharge his duties

and obligations to develop business for Symbionics.  The Court concludes that Ortlieb did not

violate or breach Paragraph 2(a) based on his personal use of his computer.

Symbionics also contends that Ortlieb violated paragraph 6 of the Agreement by

providing professional services to other businesses including OPM and Warfighter while he was

employed by Symbionics and in the twelve months following his termination in violation of the

non-compete provision in the Agreement. Paragraph 6 of the Agreement prohibits Mr. Ortlieb

from "engage[ing] in any business, engagement or employment, or aid or endeavor to assist any

business or legal entity, including [Symbionics'] customers, potential customers, or customers of

[Symbionics'] customers, which is or may reasonably be expected to be in competition with the

products and/or services of [Symbionics] including the products and services [Symbionics]

provides to the federal government and/or local municipal or commercial entities in those

localities in which [Symbionics] actively markets and/or provides its products and services." *Id.*

at ¶ 6.

While he was employed by Symbionics, Mr. Ortlieb submitted bids under the name OPM

and Warfighter. Pursuant to the Agreement, any revenue generated from these bids would have

flowed to Symbionics. *Id.* at ¶ C. Mr. Ortlieb testified that the reason certain bids were

submitted in the name of Warfighter and OPM was because Warfighter was a service-disabled,

veteran-owned business and because OPM had the ability to accept credit card payments and

became a woman-owned business, and there was no evidence from which one could reasonably

conclude otherwise. Although there was no evidence that Mr. Ortlieb informed Symbionics of

his intention to submit these bids in the name of Warfighter and OPM, there is also no evidence

that Mr. Ortlieb, Warfighter or OPM was awarded those contracts or otherwise received any

benefits that were not transferred or delivered to Symbionics. Moreover, there is no evidence,

only speculation, that had Warfighter or OPM had been awarded any of the contracts for which

bids were submitted, Mr. Ortlieb intended to breach his obligation to transfer those benefits to

Symbionics. Accordingly, Symbionics failed to sustain its burden of proof that Mr. Ortlieb

violated the terms of the non-compete provision in the Agreement while employed at

Symbionics.

The Agreement further provided that the non-compete provision remained in force for

twelve months after Mr. Ortlieb's employment at Symbionics ceased. Paragraph 7(d), however,

limits the applicability of the non-compete provision in the event Mr. Ortlieb was terminated

involuntarily. *Id.* at ¶ 7(d) ("in the event that [Mr. Ortlieb] is involuntarily terminated by the

Company prior to the 5th year anniversary of his employment [Symbionics] agrees to wave [*sic*]

Covenant Not To Compete."). Mr. Ortlieb was terminated on February 16, 2007. He did not

voluntarily resign or otherwise elect to cease his employment at Symbionics. Rather, he was

terminated by the Kaplans after he was interviewed by certified fraud investigators hired by the

Kaplans. Mr. Ortlieb's employment therefore was *involuntarily* terminated and the non-compete

provision was thereby waived. Paragraph 7(b) is unambiguous;[16] and Mr. Ortlieb's post-

termination conduct was not in breach of the Agreement.

Accordingly, after considering all of the evidence and weighing the credibility of the

witnesses, the Court concludes that Symbionics' breach of contract claim fails.

2.      Count II:  Breach of Officer's Fiduciary Duty

In Count Two, Symbionics alleges that Mr. Ortlieb, as President of Symbionics, owed

fiduciary duties to Symbionics including duties of loyalty and fidelity and that he breached his

fiduciary duties by devoting his professional time and energy towards activities intended to

benefit himself and/or corporate entities other than Symbionics. Am. Compl at ¶ 51. Under

Virginia law, to establish a breach of fiduciary duty the plaintiff must (1) identify the existence

of a corporate opportunity and (2) demonstrate that a corporate officer utilized the opportunity

for his or her personal benefit without fully disclosing it to the corporation and receiving

permission to pursue the opportunity. *Today Homes Inc. v. Williams*, 634 S.E.2d 737, 744 (Va.

2006).

---

[16] Symbionics contends that Mr. Ortlieb's termination was "voluntary," not "involuntary," since
he voluntarily engaged in conduct that gave Symbionics grounds to terminate him for breach of
his duties to Symbionics. The Court finds no merit to this position. Paragraph 7(b) was clearly
intended to avoid any dispute over whether Symbionics' termination of Mr. Ortlieb was with or
without cause for the purposes of enforcing the restrictive covenant.

For the same reasons discussed above with respect to Symbionics' claim that, while employed by Symbionics, Mr. Ortlieb violated his covenant not to compete and his obligation to devote full time and attention to Symbionics' business, Symbionics failed to prove its claim that Mr. Ortlieb breached his fiduciary duties while employed at Symbionics. Although the evidence demonstrated that Mr. Ortlieb submitted bids in the name of OPM and Warfighter while he was still employed by Symbionics and while he owed a fiduciary duty to Symbionics, neither company was awarded any of the contracts for which bids were submitted; and there is no evidence that Mr. Ortlieb would not have paid over any benefits to Symbionics had they been awarded while he remained employed at Symbionics. The Kaplans themselves seemed at the time to have no concerns in this regard since they did not protest, object or otherwise confront Mr. Ortlieb when they learned of the bids in the fall of 2006. Mrs. Kaplan in fact testified that she had did not want to accuse Mr. Ortlieb of wrongdoing at that time.

Symbionics also claims that Mr. Ortlieb breached his fiduciary duties to Symbionics after his employment was terminated in February 2007, when he obtained for OPM the NAVAIR contract for computers on which OPM bid while he was still employed with Symbionics, as well as other NAVAIR contracts that OPM first bid on after Mr. Ortlieb left Symbionics. A director or officer's fiduciary duties and obligations with respect to information or opportunities the individual learned of while employed may continue in certain respects, under certain circumstances, after the time that his employment is terminated. *See Community Counseling Service, Inc. v. Reilly*, 317 F.2d 239, 244 (4th Cir. 1963) ("Until the employment relationship is finally severed however, the employee must prefer the interests of his employer to his own. During such a period, he cannot solicit future business which his employment requires him to

solicit for his employer."). This case presents one of those circumstances; accordingly, Mr. Ortlieb continued to owe Symbionics certain duties after his termination.

After he was terminated, Mr. Ortlieb continued to pursue some of the bids and other opportunities he submitted or otherwise learned about while he was employed at Symbionics and Mr. Ortlieb submitted a bid for Symbionics' benefit. If he had not been terminated, any contracts that were awarded on the basis of these bids or opportunities would have been for the benefit of Symbionics. Accordingly, Mr. Ortlieb had a continuing duty not to divert away from Symbionics business opportunities that came to his attention while President of Symbionics.

On or about April 20, 2007, NAVAIR awarded OPM a contract to supply fourteen BCS-X computers. This contract, however, was an opportunity that first came to Mr. Ortlieb's attention while he was employed by Symbionics. For this reason, Mr. Ortlieb breached his obligation after he left Symbionics when he consummated that transaction in the name of OPM and failed to transfer the net benefits OPM received under that NAVAIR contract to Symbionics. That OPM had a relationship with NAVAIR that pre-dated Mr. Ortlieb's employment with Symbionics or that Mr. Ortlieb personally had the relationship with NAVAIR that pre-dated his employment with Symbionics is irrelevant for the purposes of this particular NAVAIR contract that was bid on by Mr. Ortlieb while he was still President of Symbionics. For this reason, Symbionics is entitled to receive from Mr. Ortlieb the net profits, in the amount of $27,597.79, plus prejudgment interest, that OPM realized from the NAVAIR contract. However, the other NAVAIR contracts that were awarded to OPM after Mr. Ortlieb's employment at Symbionics was terminated were separate from the BCS-X contract that was solicited while Mr. Ortlieb was at Symbionics. These other contracts originated from solicitations after Mr. Ortlieb left Symbionics. Mr. Ortlieb therefore did not have any continuing duty to Symbionics to turn over

the benefits from those other contracts to Symbionics. Moreover, Symbionics was fully aware that the government solicitation notices reflected an intent to award those other contracts to OPM as a sole source provider and Symbionics made no effort to obtain the contracts or to correct or otherwise inform the government that they could also fulfill the government's needs.

3. Count IV: Wrongful or Tortious Interference with Symbionics' Contract and/or Contract Expectancy

In Count IV, Symbionics alleges that Ortlieb, Mrs. Ortlieb, OPM, ATACC and Warfighter intentionally, wrongfully, and/or tortiously acted to interfere with Symbionics' contracts and/or contract expectancies. Am. Compl. at ¶¶ 62-66. In order to establish tortious interference with contract, Symbionics must demonstrate six elements: (1) existence of a business relationship or expectancy with a probability of future economic benefit; (2) defendant's knowledge of the relationship or expectancy; (3) reasonable certainty that, absent defendant's intentional misconduct, plaintiff would have continued the relationship and/or realized the expectancy; (4) defendant's intentional interference including the loss of the relationship or expectancy; (5) defendant's interference was done by improper methods; and (6) resulting damages. *Duggin v. Adams*, 360 S.E.2d 832, 835-36 (Va. 1987). Improper methods include independent illegal torts and generally improper conduct including misrepresentation. *Id.* at 836-37. To state a claim for tortious interference with business expectancy, there must also be a competitive relationship between the plaintiff and the interferer

There is no evidence that any of these defendants interfered with a contract or business expectancy that Symbionics had with respect to any of the contracts on which Ortlieb, OPM or Warfighter bid during the time that Ortlieb was employed by Symbionics. Once again, there was no evidence that any of these contracts on which Ortlieb, OPM or Warfighter bid were awarded to them, or would have been awarded to Symbionics under any circumstances. Accordingly,

there is no evidence that any of the Defendants intentionally interfered with a business
relationship or expectancy of Symbionics.

Likewise, there is no evidence that after Mr. Ortlieb left Symbionics these Defendants
tortiously interfered with any business relationship or expectancy with a probability of future
economic benefit to Symbionics. There is no evidence that absent some conduct on the part of
these Defendants, improper or otherwise, Symbionics would have realized an economic benefit.
None of the contracts awarded to OPM was part of any existing contract with Symbionics or,
indeed, any contract on which Symbionics bid or otherwise pursued. Under the circumstances,
Symbionics had no economic expectancy with respect to any of the OPM contracts whose
benefits it now seeks for itself. Symbionics' wrongful or tortious interference with Symbionics'
contract and/or contract expectancy claim fails as to all Defendants.

    4.    <u>Count VI: Misappropriation of Trade Secrets</u>

In Count Six, Symbionics alleges that Mr. Ortlieb misappropriated Symbionics' trade
secrets. Under Virginia law, misappropriation is defined as:

> 1. Acquisition of a trade secret of another by a person who knows or has reason
> to know that the trade secret was acquired by improper means; or
> 2. Disclosure or use of a trade secret of another without express or implied
> consent by a person who
> > a. Used improper means to acquire knowledge of the trade secret; or
> > b. At the time of the disclosure or use, knew or had reason to know that
> > his knowledge of the trade secret was
> > > (1) Derived from or through a person who had utilized improper
> > > means to acquire it;
> > > (2) Acquired under circumstances giving rise to a duty to maintain
> > > its secrecy or limit its use;
> > > (3) Derived from or through a person who owed a duty to the
> > > person seeking relief to maintain its secrecy or limit its use; or
> > > (4) Acquired by accident or mistake.

Va. Code § 59.1-336. Trade secrets are defined as:

[I]nformation, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that:
1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.*

Thus, to establish a claim for misappropriation of trade secret, Symbionics must demonstrate that (1) it possessed a valid trade secret; (2) Mr. Ortlieb acquired its trade secret; and (3) that Mr. Ortlieb knew or should have known that the trade secret was acquired by improper means. *Id.* The "crucial characteristic of a trade secret is secrecy." *Dionne v. SE Foam Converting & Packaging Inc.*, 240 Va. 297, 302 (1990). As the Code states, the information must not be "generally known" or "readily ascertainable by proper means." Va. Code. § 59.1-336.

Symbionics alleges that it possessed valid trade secrets that included client lists, pricing details, product information, sales documents and strategic contract bidding materials. Am. Compl. at ¶ 72. Much, if not all, of this information was available through other sources or had been publicly disclosed. For example, what Symbionics paid for the BCS-X computers was available from the vendors from whom Symbionics bought those computers and the price Symbionics charged and was paid was known to the government and listed on the contract awards. As the Virginia Supreme Court has held, "[t]he owner of a trade secret is not entitled to prevent others from using public information to replicate his product." *MicroStrategy Inc. v. Li*, 60 S.E.2d 580, 588 (Va. 2004). In any event, there is no evidence that Mr. Ortlieb or the other Defendants used any information that Symbionics claims is a trade secret or otherwise protected. In fact, at trial, Mrs. Kaplan testified that she had no knowledge that Mr. Ortlieb used any

alleged trade secret information or otherwise disclosed any alleged trade secret information after his employment was terminated. Thus, there is no evidence that Ortlieb used or disclosed Symbionics' trade secrets information. *See* Tr. at 264:3-265:7.

### 5.      Count VII – Injunctive Relief

Count VII of the Amended Complaint seeks injunctive relief against all Defendants enjoining them from using Symbionics' proprietary information and/or trade secrets. The Court finds that the evidence at trial did not establish that Symbionics possessed any valid trade secrets and that the evidence did not establish that Mr. Ortlieb used or disclosed any alleged trade secret information after his employment at Symbionics was terminated. Accordingly, the facts do not justify entering an injunction against Defendants' future conduct.

## B.      Amended Counterclaim

### 1.      Count I:  Breach of Contract (Symbionics Shares and Damages, or in the Alternative, Specific Performance)

In Count I of Defendants' Amended Counterclaims, Mr. Ortlieb alleges that Symbionics breached the Agreement by failing to provide him with shares in Symbionics at the time he was terminated. Mr. Ortlieb argues that when Mrs. Kaplan became the CEO of Symbionics in November 2006, Symbionics was "acquired" and Paragraph 5 of the Agreement was triggered. In the alternative, Mr. Ortlieb argues that as a result of his termination he is entitled to "shares of [Symbionics] equal to one-third of one percent (.0033) of the outstanding shares multiplied by the number of months of service completed, including the month of termination, plus any Additional Shares acquired." *See* Def.'s Ex. 1 at ¶ 7(b).

As stated above, the essential elements of a cause of action for breach of contract are (1) a legal obligation of a defendant to a plaintiff; (2) a violation or breach of that obligation; and (3) a consequential injury or damage to the plaintiff. *Hamlet v. Hayes*, 641 S.E.2d 115 (Va. 2007)

(quoting *Caudill v. Wise Rambler*, 168 S.E.2d 257, 259 (Va. 1969)). Symbionics contends that Mr. Ortlieb's breach of contract claim fails because under Virginia law, the first party to materially breach a contract cannot later ask the Court to enforce the contract for their benefit. *See, e.g.*, *Countryside Orthopedics, P.C. v. Peyton*, 261 Va. 142, 154 (2001) (citing *Horton v. Horton*, 254 Va. 111, 115 (1997)). Without debating the merits of that position, the Court finds that Mr. Ortlieb did not breach the Agreement and Mr. Ortlieb is not precluded from asking the Court to enforce the Agreement.

At the time Mrs. Kaplan was appointed CEO, Mr. Kaplan also contemplated transferring 51% of the ownership of Symbionics to Mrs. Kaplan. *See* Def.'s Ex. 17. However, no such transfer of ownership was made during the time Mr. Ortlieb remained employed at Symbionics. Moreover, even if such transfer had occurred, it is not clear that a transfer of ownership between a husband and wife, who was already an employee of Symbionics, would constitute an "acquisition" under Paragraph 5 of the Agreement. *See* Def.'s Ex. 1 at ¶ 5.

Paragraph 7(b), however, provided that if Mr. Ortlieb was involuntarily terminated prior to five years at Symbionics, he is entitled to receive one-third of one percent of the outstanding shares multiplied by the number of months of service completed, including the month of termination. *Id.* at ¶ 7(b). Mr. Ortlieb was involuntarily terminated on February 16, 2007. He had begun his employment at Symbionics in January 2005. Mr. Ortlieb therefore had completed twenty-six months of service, as calculated for purposes of Paragraph 7(b). There are 5,000 authorized shares in Symbionics. Accordingly, Mr. Ortlieb is entitled under the Agreement to four hundred thirty-three and one-third shares.

The Court further finds that any damages from Symbionics' failure to issue these shares to Mr. Ortlieb are speculative given that Symbionics is a closely held company and there is no

ascertainable market-value of its shares. For this and other reasons, Mr. Ortlieb is entitled to specific performance. *See, e.g.*, *Kennerly v. Columbia Chemical Corp.*, 119 S.E. 265, 267 (Va. 1923) ("[S]pecific performance may be had of a contract to deliver stock, the pecuniary value of which is uncertain and not easily ascertainable, or where the stock has no market value; the remedy at law in such cases being deemed to be inadequate." (citations omitted)). Symbionics will therefore be ordered to issue and deliver four hundred thirty-three and one-third shares of Symbionics stock to Mr. Ortlieb.

### 2. Count II: Breach of Contract (Payments)

Count II of the Amended Counterclaim alleges that Symbionics breached the Agreement by failing to pay Mr. Ortlieb his salary for the payroll period beginning on February 1, 2007 up until his termination on February 16, 2007. Mr. Ortlieb also alleges that Symbionics breached the Agreement by failing to pay him severance pursuant to Paragraph 7(b) of the Agreement. The elements that Mr. Ortlieb must prove are set forth above in Section F.

The Agreement provided that Mr. Ortlieb would be paid a yearly salary of $85,000 "payable in accordance with [Symbionics'] normal payroll practices." Def.'s Ex. 1 at ¶ 3. The evidence at trial was that at the time Mr. Ortlieb was terminated on February 16, 2009, he had not been paid for the period beginning on February 1, 2009. Symbionics breached the Agreement by failing to pay Mr. Ortlieb's salary in accordance with the terms of Paragraph 3. Accordingly, Mr. Ortlieb is entitled to damages in the amount of $3,863.64 plus prejudgment interest.

Paragraph 7(b) provides that "[s]everance shall be paid in an amount equal to two (2) months salary for each year of service completed, including the year of termination, at [Mr. Ortlieb's] highest Base Salary for the last completed year of service." Def.'s Ex. 1 at ¶ 7(b). At

the time of his termination on February 16, 2007, Mr. Ortlieb had three years of service as calculated pursuant to Paragraph 7(b). Mr. Ortlieb's base salary was $85,000. Mr. Ortlieb was therefore entitled to severance in the amount of $42,500. Symbionics failed to provide the required severance payment and Mr. Ortlieb was therefore damaged in an amount equal to $42,500 plus prejudgment interest.

The Agreement further provides that "[i]n any dispute which is finally resolved through arbitration or in a court of competent jurisdiction, the prevailing party (as defined below) shall be entitled to reimbursement for all reasonable attorneys' fees and witness expenses." *Id.* at ¶ 15(b); *see also* Joint Stipulation as to Award of Attorneys Fees (Doc. No. 95). The Court, pursuant to the terms of Paragraph 15(b) and the Joint Stipulation as to Award of Attorneys Fees, finds that Mr. Ortlieb is the "prevailing party" and is therefore entitled to attorneys' fees and witness expenses under the terms set forth in the Joint Stipulation as to Award of Attorneys Fees.

3.   Count III (Alternative): Unjust Enrichment (First Loan)

In Alternative Count III of the Amended Counterclaim,[17] Defendants claim that Symbionics was unjustly enriched in the amount of $33,000, which represents the loan Mr. Ortlieb made to Symbionics for payroll expenses. In Virginia, three elements are required to establish a quasi-contract and unjust enrichment: (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation of the benefit by the defendant; and (3) retention of that benefit by the defendant where it would be inequitable for the defendant to retain the benefit without reimbursing the plaintiff for the value received. *Nossen v. Hoy*, 750 F. Supp. 740, 744-45 (E.D. Va. 1990) (citing *Kern v. Freed Co.*, 299 S.E.2d 363 (Va. 1983)). A cause of action for unjust

---

[17] By Order dated October 28, 2008, the Court granted Symbionics' motion for summary judgment as to Count III of the Amended Counterclaim which sought repayment of the first loan under a breach of contract theory.

25

enrichment must arise from a "contract implied in law," not an express contract. *Po River Water & Sewer Co. v. Indian Acres Club*, 495 S.E.2d 478, 482 (Va. 1998)).

The evidence at trial established that on May 1, 2006, Mr. Ortlieb loaned Symbionics $33,000 from the equity line on his home. Mr. Ortlieb did not receive a promissory note from Symbionics or enter into any other contractual arrangement regarding the terms of the loan. The evidence, however, showed that Mr. Ortlieb loaned the money and that Symbionics agreed to repay the loan.

The $33,000 loan was a benefit that Mr. Ortlieb conferred on Symbionics that Symbionics has since retained without reimbursing Mr. Ortlieb. Accordingly, Symbionics has been unjustly enriched in the amount of $33,000 and Mr. Ortlieb is entitled to judgment in the amount of $33,000 together with prejudgment interest.

4.     Count IV:  Unjust Enrichment (Second Loan & Additional Expenses)

In Count IV, Defendants claim that Symbionics also was unjustly enriched in the amount of $23,246.71. Specifically, Defendants contend that they are entitled to damages in the amount of a $20,000 payment Mr. Ortlieb made on behalf of Symbionics to Cormac and $3,246.71 of additional expenses as a result of Symbionics' retention of Mr. Ortlieb's personal property after he was terminated. The elements required to establish unjust enrichment are set forth in Section H.

The evidence at trial demonstrated that on October 11, 2006, Mr. Ortlieb personally paid an outstanding invoice from Cormac in the amount of $20,000. The evidence further showed that this invoice was for approximately four months of services that Cormac had already provided to Symbionics and that Symbionics had agreed to pay Cormac's bills. The $20,000 paid by Mr. Ortlieb, therefore, satisfied Symbionics' obligation to pay Cormac and is therefore a

benefit Mr. Ortlieb conferred on Symbionics. The Court finds that Symbionics was unjustly enriched by failing to reimburse Mr. Ortlieb for the $20,000 he paid to Cormac.

The evidence at trial also demonstrated that at the time Mr. Ortlieb was terminated he had incurred certain expenses on behalf of Symbionics for which he has not been reimbursed. These expenses included the cost of flights and hotels for business travel. Symbionics has not reimbursed Mr. Ortlieb for these expenses and Symbionics has therefore been unjustly enriched in the amount of $3,246.71.

Accordingly, Mr. Ortlieb is entitled to damages in the amount of $23,246.71 plus prejudgment interest.

5.     Count V: Conversion (Or in the Alternative, Detinue)

In Virginia, the tort of conversion "encompasses 'any wrongful exercise or assumption of authority . . . over another's goods, depriving him of their possession; [and any] act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it.'" *United Leasing Corp. v. Thrift Ins. Corp.*, 440 S.E.2d 902, 905 (Va. 1994) (quoting *Universal C.I.T. Credit Corp. v. Kaplan*, 92 S.E.2d 359, 365 (Va. 1956)). In other words, conversion occurs when a person exercises control over another's property without authorization from the rightful owner to do so.

The evidence at trial demonstrated that at the time Mr. Ortlieb was terminated, Symbionics remained in possession of certain personal property that belonged to Mr. Ortlieb. Specifically, Mr. Ortlieb's testimony that items including a picture frame and eye glasses remained in his office at Symbionics after he was terminated, that Symbionics has subsequently refused to return the property to him, and that the value of these items is $1,505.80, was not challenged. The Court finds that Symbionics has wrongfully exercised authority over Mr. Ortlieb's property thereby depriving him of possession of such property. Mr. Ortlieb is entitled

27

to damages in the amount of $1,505.80, plus prejudgment interest, for Symbionics' conversion of his personal property.

Defendants also seek punitive damages in Count V.  When a plaintiff pleads and proves an intentional tort under the common law of Virginia, the trier of fact may award punitive damages.  *Foreign Mission Bd. V. Wade*, 409 S.E.2d 144, 148 (Va. 1991); *see also Kamlar Corp. v. Haley*, 299 S.E.2d 514, 518 (1983).  The purpose of punitive damages "is not so much to compensate the plaintiff but to punish the wrongdoer and to warn others," and such damages "may be recovered only where there is misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of others.  *Hamilton Dev. Co. v. Broad Rock Club*, 445 S.E.2d 140, 143 (1994) (quotation omitted).  The Court concludes based on all the evidence and circumstances surrounding this dispute that an award of punitive damages is not appropriate.  *See generally Sit-Set, A.G. v. Universal Jet Exch., Inc.*, 747 F.2d 921 (4th Cir. 1984) ("Virginia does not permit recovery of punitive damages except upon proof of a degree of aggravation in the critical state of mind above the threshold level required to establish liability for compensatory relief.").

## CONCLUSION

As set forth above, based on the evidence at trial, reasonable inferences drawn therefrom and the Court's assessment of the credibility of the witnesses, the Court concludes that under Count II of the Amended Complaint, Symbionics is entitled to recover from Mr. Ortlieb $27,597.79 plus prejudgment interest.  The Court further concludes that Symbionics breached its employment contract with Mr. Ortlieb by failing to deliver shares of Symbionics, severance and the outstanding paycheck to Mr. Ortlieb; that Symbionics was unjustly enriched by its retention of benefits conferred on it by Mr. Ortlieb; and that Symbionics converted certain personal

28

property belonging to Mr. Ortlieb.  Accordingly, Mr. Ortlieb is entitled to recover from Symbionics as follows:  (1) as to Count I of the Amended Counterclaim, four hundred and thirty-three and one-third shares of Symbionics stock; (2) as to Count II of the Amended Counterclaim, $46,363.64 plus prejudgment interest and attorneys' fees pursuant to the Joint Stipulation as to Award of Attorneys Fees; (3) as to Alternative Count III of the Amended Counterclaim, $33,000 plus prejudgment interest; (4) as to Count IV of the Amended Counterclaim, $23,246.71 plus prejudgment interest; and (5) as to Count V of the Amended Counterclaim, $1,505.80 plus prejudgment interest.

An appropriate Order will issue.

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
August 7, 2009